UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNIVERSAL TRADING &          )
INVESTMENT COMPANY, INC., and )
FOUNDATION HONESTY            )
INTERNATIONAL, INC.,          )
                             )
          Plaintiffs,        )   Civil Action No.
                             )   10-12015-DPW
v.                           )
                             )
BUREAU FOR REPRESENTING       )
UKRAINIAN INTERESTS IN        )
INTERNATIONAL AND FOREIGN     )
COURTS; UKRAINIAN PROSECUTOR  )
GENERAL'S OFFICE; UKRAINE,    )
                             )
          Defendants.        )
```

MEMORANDUM AND ORDER
September 19, 2012

This case involves the alleged failure of agencies or
instrumentalities of the Republic of Ukraine to pay for asset
recovery work performed by a private entity.  The principal issue
is whether the Foreign Sovereign Immunities Act bars the
jurisdiction of this Court to hear the matter.  I conclude that
it does not.

I.  BACKGROUND

The plaintiff Universal Trading and Investment Company, Inc.
("UTICo") is a Massachusetts corporation that engages in
international asset recovery operations.  Plaintiff Foundation
Honesty International, Inc. ("Foundation") is a Massachusetts
nonprofit to which UTICo made the commitment to allocate a
substantial portion of the fees paid by the Defendants for that
work.

The defendant Ukranian Prosecutor General's Office ("UPGO"), the prosecutorial agency in Ukraine, engaged UTICo to recover assets expatriated from Ukraine by United Energy Systems of Ukraine ("UESU"), its principals, and its parent company United Energy International, Ltd.  The defendant Bureau for Representing Ukrainian Interests in International and Foreign Courts ("Bureau") is responsible for paying and supporting foreign firms acting under contract in the interests of Ukraine.  Both UPGO and the Bureau are agencies or instrumentalities of the Ukrainian government.

**A.  *The Agreement and Performance***

In 1998 UPGO contacted UTICo and the two parties agreed that UTICo would engage in asset recovery work on behalf of Ukraine. Ukrainian Deputy Prosecutor General Nikolai Obikhod traveled to New York to negotiate an agreement with UTICo's representatives. The May 15, 1998, Agreement stated:

> Taking into account information and assistance that Universal Trading & Investment Co. is providing in regard to the activities of United Energy Systems of Ukraine (Ukraine, Dnepropetrovsk) and United Energy International Ltd. (London, U.K.), as well as its principals, shareholders, and the assets of the shareholders, the Prosecutor General's Office of Ukraine has agreed that Universal Trading & Investment Co. will be attributed a commission of 12 (twelve) percent on all and any above assets to be returned to Ukraine, in connection with the Power of Attorney of the Prosecutor General's Office of May 14, 1998.
> The Prosecutor General's Office of Ukraine confirms its commitment to engage for that the appropriate State bodies of Ukraine and to appropriately secure the permission for the above remuneration, taking into account that that remuneration is not payable from the State budget of Ukraine

but from the assets to be repatriated to Ukraine from
outside of Ukraine.

The Agreement bore the UPGO letterhead, including the Coat of
Arms of Ukraine, and the signature of B. Ferents, the Acting
Prosecutor General of Ukraine.  It was delivered to UTICo's
office in Massachusetts.

After a new Prosecutor General, Mikhailo Potebenko, was
confirmed by the Ukrainian parliament in September, 1998, he
confirmed the May 15, 1998, Agreement in a letter dated October
2, 1998.  It stated:

> With reference to our letter registered No. 12-01379-97 of
> May 15 of this year and the follow-up Powers of Attorney of
> August 5 and of September 23 of this year, the present
> statement is to certify the previously agreed terms in
> regard to the unlawful assets outside of Ukraine of the
> Ukrainian citizens who illegally became the beneficiaries of
> PFG United Energy Systems of Ukraine and of United Energy
> International Ltd., and in regard to work on the return of
> such assets to Ukraine.

The letter bore the UPGO letterhead, including the Coat of Arms
of Ukraine, and the signature of the Prosecutor General.  It was
delivered to UTICo during a trip to the United States.

In addition to these agreements, UPGO granted Powers of
Attorney to UTICo and/or the attorneys selected by UTICo to
pursue multiple different investigations and actions on its
behalf in particular jurisdictions.  For instance, UPGO executed
powers of attorney relating to work in the British Virgin
Islands, the Bahamas, Panama, and Barbados.  UTICo used these

3

powers of attorney in order to accomplish its asset recovery work on behalf of Ukraine.

UTICo alleges that its work was instrumental in freezing many millions of dollars worth of assets that had been expatriated by UESU.  It provided the evidence to UPGO that allowed UPGO to freeze $144 million of assets in the Balford Trust and an additional unknown amount of assets in the BL Trust maintained by Credit Suisse AG Bank in Guernsey, the Channel Islands, in 1998.  It also provided the evidence to UPGO that allowed UPGO to freeze over $100 million of assets held by Eurofed Bank in Antigua, Lithuania, and Switzerland in 1999 and 2000.

UTICo additionally collected evidence in the Bahamas, Panama, Cyprus, Nauru, Isle of Man, Jersey, St. Kitts, and the Cayman Islands.  Based on the evidence it obtained, UPGO was able to prosecute in Ukraine claims for stolen assets in excess of $1 billion.  Ukraine also received over $10 million in bail, fines, and money confiscated in connection with criminal prosecutions of individuals involved in expropriation of Ukrainian assets.

**B.  *Assignment of Interest and Subsequent Litigation in Federal Court***

UTICo also discovered expropriated Ukrainian assets in the United States.  UTICo developed evidence that former Ukrainian Prime Minister Pavlo Lazarenko and his assistant Petro Kiritchenko had used expropriated Ukrainian assets to acquire

4

real estate in the San Francisco area.  UTICo provided the evidence to UPGO and proposed that a civil action be initiated to secure that real estate.  The parties arranged for UTICo to initiate such litigation.

On April 13, 1999, the Prosecutor General issued a letter to the United States District Court for the Northern District of California stating that "the Prosecutor General Office of Ukraine supports suit of UTICo to attach all realty of Petro M. Kiritchenko on the territory of the USA, which was acquired by him for proceeds from crime and registered on the companies controlled by him" and that "[t]he Prosecutor General Office of Ukraine seeks to entrust UTICo to represent its interests in the court in order to effect further proceedings in regard of returning to Ukraine the property exceeding the amount, awarded for the benefit of UTICo."

On April 30, 1999, the Prosecutor General executed a Power of Attorney to UTICo "to organize and to implement in the USA the legal work, seeking judgment on attaching such assets [of Lazarenko and Kiritchenko in the United States] . . . ."  It stated that "[i]n particular UTICo. is empowered to involve in the necessary judicial proceedings in USA and for accomplishing designated juridical tasks in representing Ukraine's material claims . . . law firms and lawyers, selected by UTICo, . . . and to relieve those from such juridical tasks."

UTICo's counsel prepared a Complaint in the names of both Ukraine and UTICo to secure the realty in California.  But UGPO declined to execute the documents, explaining that the President's office had decided against Ukraine's becoming a party in litigation in the United States.  Instead, UPGO offered to assign the claims in the United States to UTICo as compensation for its asset recovery work conducted thus far.

On June 24, 1999, UTICo filed the action in the Northern District of California in its own name.  On August 11, 1999, Deputy Prosecutor General Obikhod executed the Assignment of the claims, which stated:

> Taking into consideration the work accomplished by, and the assistance from, your company as well as the civil law suit by UTICo in regard to the real estate property in the USA . . . we confirm the consent that the Ukrainian side assigns the material claims upon the real estate property mentioned above to the firm UTICo in such amounts in which you will be able to prove the unlawful ownership thereof in your U.S. District Court, with the term that such amounts will be in the future credited into the amounts ought to be paid by the Ukraine side for your services, that is into the 12% of all funds returned to Ukraine from outside of its borders with the assistance of UTICo, as it was stipulated in the letters of the Prosecutor General's Office of Ukraine . . . .

The Assignment bore the UPGO letterhead, including the Coat of Arms of Ukraine, and the signature of the Deputy Prosecutor General.  It was delivered to UTICo's office in Massachusetts.

Kiritchenko and Lazarenko challenged the Assignment in Ukrainian courts.  Each filed an action against UPGO, designating UTICo as a third party but failing to serve UTICo.  In March,

2003, a municipal judge denied Kiritchenko's challenge based on the expired statute of limitations but stated in dicta that the Assignment was invalid.

In September, 2003, a municipal court judge ruled in favor of Lazarenko, stating that UPGO had exceeded its powers in issuing the Assignment.  UPGO appealed and obtained a reversal by the Court of Appeals in Kiev, but in 2005 Lazarenko obtained a decision in his favor from the same court.  In June, 2006, the Ukrainian Supreme Court vacated and remanded on procedural grounds.  The municipal court thereafter dismissed Lazarenko's claim without further substantive consideration when his representative failed to appear in court.[1]

Meanwhile, the United States District Court for the District of Northern California was also considering the validity of the Assignment.  On September 7, 2007, Judge Chesney dismissed the case that UTICo had filed there in 1999, finding that UTICo lacked standing to bring the action because UPGO did not have the authority to assign Ukraine's claims to the property.  *See Universal Trading & Inv. Co.* v. *Kiritchenko*, No. C-99-3073, 2007

---

[1]   While the reasoning behind the court decisions is not detailed in the Complaint, the Complaint incorporates the decisions by reference.  The Plaintiffs have provided their translations of these decisions in support of their Opposition to the Defendants' Motion to Dismiss.  For the purposes of the Motion to Dismiss, I will accept the Plaintiffs' translations of these and other Ukrainian language documents, such as the 1998 Agreement and confirmatory letter and the Assignment.

WL 2669841 (N.D. Cal. Sept. 7, 2007).  Judge Chesney examined
Ukrainian law independently of the Ukrainian court decisions and
then noted that "[t]he Ukrainian court decisions are in accord
with this Court's finding and provide further support therefor."
*Id.* at *19.  "In sum, the Court conclude[d] that [UPGO's]
assignment to UTI[Co was] invalid under Ukrainian law, and,
accordingly, that UTI[Co] lack[ed] standing, based on such
assignment, to bring the . . . action."  *Id.* at *20.

The District Court did not have in its records the Ukrainian
Supreme Court decision or the municipal court decision that
followed on remand when it granted summary judgment in the
California case.  UTICo was unaware of these decisions and could
not obtain them because Ukrainian court records are unavailable
to non-parties; UPGO had failed to advise UTICo about the
decisions and had not sent UTICo copies.  After Judge Chesney
issued her decision, UTICo contacted UPGO and urged it to take
emergency measures so that UTICo could show that the Assignment
was valid.  However, UPGO did not release the decisions to UTICo
until March, 2008.  UPGO did nothing else to support the validity
of the Assignment in the District Court. UTICo asserts that this
inaction was due the political influence exercised by former
Prime Minister Yulia Tymoshenko, who had an interest in UESU.

Upon receiving the decisions, UPGO sought to file a motion
pursuant to Federal Rule of Civil Procedure 60(b) based on the

Ukrainian decisions.  The motion was denied.  Judge Chesney noted
that "the Ukrainian Supreme Court's reversal and remand in
Lazarenko's Ukrainian case was based on procedural deficiencies
and did not purport to find the assignment valid . . . and, on
remand, Lazarenko's case was dismissed without prejudice as a
result of his counsel's failure to appear." *Universal Trading &
Inv. Co.* v. *Kiritchenko*, No. C-99-3073, 2008 WL 2445073, at *2
(N.D. Cal. June 16, 2008).  She also emphasized that "as the
Summary Judgment Order makes clear, this Court reached it[]s
decision by an analysis that did not depend upon the Ukrainian
court decisions submitted by the parties."  *Id.*  "Consequently,"
she concluded, "plaintiff has failed to show any failure to
disclose those decisions affected, in any manner, this Court's
determination of the issues addressed in the Summary Judgment
Order . . . ."  *Id.*

UTICo appealed to the Ninth Circuit.  In affirming the
District Court's decision, the Ninth Circuit stated:

> The district court did not err in concluding the assignment
> was invalid under Ukrainian law.  The purported assignment
> of claims by Ukraine was a sham created only to overcome
> defendants' initial challenge to UTI[Co]'s standing.  Even
> were it not, UTI[Co] failed to prove the assignment was
> valid under Ukrainian law.  UTI[Co] failed to prove a deputy
> prosecutor general had the authority to assign the rights of
> the Ukrainian government against Kiritchenko and Lazarenko
> to UTI[Co].

*Universal Trading & Inv. Co., Inc.* v. *Kiritchenko*, 346 F.App'x
232, 232 (9th Cir. 2009).

UTICo then submitted a petition for certiorari to the
Supreme Court of the United States.  Although UTICo requested
UPGO to intervene before the Supreme Court with an amicus brief,
UPGO did not do so.  UPGO advised UTICo that the Bureau was
better suited to submit such a brief.  Ultimately, the Ukranian
Minister of Justice wrote a letter to the Supreme Court, but did
not issue it until June 24, 2010, the date of the Conference
during which the petition was considered.  The Supreme Court
denied certiorari.  *See Universal Trading & Inv. Co., Inc.* v.
*Kiritchenko*, 130 S. Ct. 3504, 3504 (2010).

## C.   *The Instant Litigation*

On November 26, 2010, the Plaintiffs filed the instant
action, suing the Defendants under seven separate counts.

In Count One, the Plaintiffs allege that the Defendants
breached the Assignment by failing to support its validity under
Ukrainian law.

In Count Two, the Plaintiffs allege that the Defendants
breached the 1998 Agreements by failing to pay UTICo in an amount
equal to twelve percent of the assets frozen outside of Ukraine.

In Count Three, the Plaintiffs allege that the Defendants
were unjustly enriched by UTICo's asset recovery services.

In Count Four, the Plaintiffs allege that the Defendants
breached the fiduciary duty they owed to UTICo by failing to
disclose the Ukrainian Supreme Court decision or the subsequent

municipal court decision in a timely manner and by failing to assist UTICo by submitting an amicus brief to the U.S. Supreme Court in 2010.

In Count Five, the Plaintiffs allege that the Defendants are liable for misrepresentation for their failure to timely inform UTICo of the Ukrainian court decisions.

In Count Six, the Plaintiffs allege that the Defendants were negligent in their failure to timely transfer to UTICo the Ukrainian court decisions.

Finally, in Count Seven, the Plaintiffs request declaratory judgment that (1) UTICo is not subject to Ukrainian jurisdiction and no Ukrainian court decisions concerning it will be recognized in Massachusetts; and (2) the April 30, 1999, Power of Attorney was in force until at least the denial of UTICo's petition to the Supreme Court for a writ of certiori.

In the motion to dismiss before me, the Defendants argue that they are immune from suit because they are a foreign sovereign and its divisions; that venue in Massachusetts is improper; and that in each Count of the Complaint the Plaintiffs have failed to state a claim upon which relief can be granted. In addition, they contend the Foundation should be dismissed from the case because it does not have standing to bring the action. I will address the Defendants' claims of sovereign immunity first as a threshold matter.

## II.  FOREIGN SOVEREIGN IMMUNITY

Jurisdiction over this case turns on the Foreign Sovereign Immunities Act ("FSIA").  "The Foreign Sovereign Immunities Act provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 355 (1993) (internal quotation omitted).  "[I]f none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction." *Verlinden B.V.* v. *Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983).

### A.  *Burden of Proof*

While the First Circuit has not directly addressed the burdens of the parties with respect to a FSIA action, almost every other circuit has done so.  The Second Circuit has stated that "the defendant must present a *prima facie* case that it is a foreign sovereign"; the plaintiffs then have the "burden of production" of offering "evidence showing that, under exceptions to the FSIA, immunity should not be granted"; and finally, "the ultimate *burden of persuasion* remains with the alleged foreign sovereign" to show that none of the pertinent exceptions applies. *Virtual Countries, Inc*. v. *Republic of S. Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (emphases in original, internal citations omitted).  The Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits have established the same

12

burden-shifting framework.  *See Peterson* v. *Islamic Republic of Iran*, 627 F.3d 1117, 1124-25 (9th Cir. 2010); *Butler* v. *Sukhoi Co.*, 579 F.3d 1307, 1312-13 (11th Cir. 2009); *O'Bryan* v. *Holy See*, 556 F.3d 361, 376 (6th Cir. 2009); *FG Hemisphere Associates, LLC* v. *Democratic Republic of Congo*, 447 F.3d 835, 842 (D.C. Cir. 2006); *Enahoro* v. *Abubakar*, 408 F.3d 877, 882 (7th Cir. 2005); *Velasco* v. *Government of Indonesia*, 370 F.3d 392, 397 (4th Cir. 2004); *Southway* v. *Central Bank of Nigeria*, 328 F.3d 1267, 1271 (10th Cir. 2003); *Federal Ins. Co.* v. *Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1285 (3rd Cir. 1993); *Stena Rederi AB* v. *Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadad*, 923 F.2d 380, 390 n.14 (5th Cir. 1991).  I will adopt this burden-shifting protocol.  And in this connection, I reject attempts by both the Plaintiffs[2] and the

---

[2] The Plaintiffs contend that the Defendants cannot raise their objections to the applicability of two FSIA exceptions--the expropriation exception and the immovable property exception--for the first time in their Reply Brief to the Plaintiffs' Opposition to the Defendants' Motion to Dismiss.  However, the Plaintiffs themselves for their part first addressed those two exceptions in their own Opposition.  Under the burden shifting framework, the Defendants are not obligated to address an exception until the Plaintiffs have met their burden of production with respect to that exception.  The Defendants did not "waive" these arguments, as the Plaintiffs contend, before the Plaintiffs had even raised the exceptions or put them at issue.  The Fifth Circuit has expressly rejected this argument, stating that "[t]he party seeking immunity has no obligation to affirmatively eliminate all possible exceptions to sovereign immunity." *Stena Rederi AB*, 923 F.2d at 390 n.14.  I agree and will not disregard the Defendants' briefing.

Defendants[3] to exclude certain argument and evidence offered by the opposing parties relating to sovereign immunity.

The parties do not dispute that the Defendants are instrumentalities of a foreign state within the scope of the FSIA.  Consequently, I turn directly to the four exceptions to the FSIA at issue: waiver, expropriation, immovable property, and commercial activity.[4]  While I find only the commercial activity

---

[3] The Defendants contend that the Plaintiffs cannot raise particular exceptions and offer facts in support of those exceptions for the first time in their Opposition to the Defendants' Motion to Dismiss.  The Defendants cite *Westfield* v. *Federal Republic of Germany*, 633 F.3d 409, 413 (6th Cir. 2011) and *Swarna* v. *Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010) in support of the proposition that the Plaintiffs had the burden to plead exceptions to immunity under the FSIA.  However, those decisions address the Plaintiffs' burden of production in offering evidence regarding the statutorily defined exceptions. Neither mentions nor establishes a pleading requirement that any applicable exceptions must be alleged in the complaint.  Nor would such a requirement make sense in the burden-shifting framework; the plaintiff's burden of production arises only *after* the defendant has presented a prima facie case that it is a foreign sovereign.

The Defendants also rely on *Miller* v. *Suffolk County House of Correction*, Civ. A. 01-11331-DPW, 2002 WL 31194866 (D. Mass. Sept. 27, 2002), a case addressing motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), in support of their contention that new factual allegations may not be made for the first time in an Opposition to a Motion to Dismiss.  The Defendants' challenge under the FSIA, unlike the challenge brought in *Miller*, is made pursuant to Federal Rule of Civil Procedure 12(b)(1) and (2).  The First Circuit has held that "[w]hile the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion . . . ." *Gonzalez* v. *United States*, 284 F.3d 281, 288 (1st Cir. 2002).  Especially in light of the burden-shifting framework under the FSIA, consideration of such materials is appropriate here.

[4] While the Defendants also address the noncommercial tort exception in their Motion to Dismiss, the Plaintiffs do not

exception applicable, I discuss the other inapplicable exceptions first to put the scope of the FSIA in full context.

## B.    *Waiver*

Under the FSIA, a foreign sovereign is not immune from the jurisdiction of United States courts in any case "in which the foreign state has waived its immunity either explicitly or by implication . . . ." 28 U.S.C. § 1605(a)(1).  The Plaintiffs contend that the Defendants waived their immunity when they executed the 1998 Agreement, the Powers of Attorney, and the Assignment.  The Plaintiffs fail to carry their burden of production: the documents do not establish either an express or implicit waiver under the FSIA.

Nothing in any of the cited documents expressly waives Ukraine's sovereign immunity.  "The standard for finding a waiver is quite stringent.  A waiver must be 'unequivocally expressed' and 'must be strictly construed in favor of the sovereign,' with ambiguities construed against waiver." *In re Rivera Torres*, 432 F.3d 20, 23-24 (1st Cir. 2005) (internal citations omitted).  "A foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so." *World Wide Minerals, Ltd.* v. *Republic of Kazakhstan*, 296 F.3d 1154, 1161-62

---

challenge the Defendants' assertion that this exception does not apply.  The Plaintiffs do not carry--or even assert their intention to carry--the burden of production in demonstrating that the claims of their complaint are based on a noncommercial tort.

(D.C. Cir. 2002).  *See also Estates of Ungar and Ungar ex rel.
Strachman* v. *Palestinian Authority*, 325 F.Supp.2d 15, 26-27
(D.R.I. 2004) ("An express waiver under the FSIA must give a
clear, complete, unambiguous, and unmistakeable manifestation of
the sovereign's intent to waive its immunity.").

Here, the Plaintiffs do not, and cannot, point to any
particular language in any of the documents that they offer that
explicitly waives Ukraine's sovereign immunity.  There is no
language that might even arguably be construed to waive immunity.
While the Plaintiffs contend that the Power of Attorney allowing
UTICo to attach the real property in the United States
constitutes an express waiver, there is no language in that
document relating to waiver of immunity.  Nor do the Plaintiffs
point to any particular language in any other document.

The Plaintiffs' contention that implied waiver applies here
is equally unsuccessful.  The Plaintiffs argue that the powers of
attorney and the agency relationship that they created implied
that Ukraine had waived its sovereign immunity.  They do not cite
any case, nor am I aware of any, that supports the proposition
that an agency relationship or even a fiduciary relationship
vitiates sovereign immunity pursuant to the waiver exception.
The case that the Plaintiffs do cite, *Maritime Ventures
International, Inc.* v. *Caribbean Trading & Fidelity, Ltd.*, 722 F.
Supp. 1032 (S.D.N.Y. 1999), is inapposite.  It relates to whether
a private agent, as opposed to an agent protected by sovereign

immunity, may waive sovereign immunity on behalf of a government. It does not address whether a government impliedly waives its immunity merely by contracting with a private agent for the purposes of suits brought by that private agent.

By contrast to the Plaintiffs' expansive view of implied waiver, "[f]ederal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed narrowly." *Shapiro* v. *Republic of Bolivia*, 930 F.2d 1013, 1017 (2d. Cir. 1991). Courts have found implied waiver in the three sets of circumstances mentioned in the legislative history--where a foreign state has filed a responsive pleading without raising the defense of sovereign immunity, where the foreign state has agreed to arbitrate in another country, and where the foreign state has agreed that the law of another country should govern the contract--but "courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." *World Wide Minerals*, 296 F.3d at 1161 n.11. Nothing about the facts of this case justifies overcoming that reluctance to find implied waiver here and I decline to do so.

## C.   *Expropriation*

The Plaintiffs contend that the Defendants fall under the "expropriation exception" to foreign sovereign immunity. Under the FSIA, a foreign sovereign is not immune from suit in any case

in which rights in property taken in violation of
international law are in issue and that property or any
property exchanged for such property is present in the
United States in connection with a commercial activity
carried on in the United States by the foreign state; or
that property or any property exchanged for such property is
owned or operated by an agency or instrumentality of the
foreign state and that agency or instrumentality is engaged
in a commercial activity in the United States . . . .

28 U.S.C. § 1605(a)(3).  The Plaintiffs contend that "[t]he

invalidation by the Bureau of the Assignment . . . represented a

taking and expropriation, falling within the 'expropriation

exception.'  Instead of the lawful remuneration of UTICo, the

Bureau gave the attached realty properties back to the Ukrainian

fugitives Lazarenko and Kiritchenko . . . ."

The Defendants contend that the expropriation exception does

not apply because the Plaintiffs never possessed the California

realty such that it could be taken by the Defendants.  The

Assignment, it is true, did not transfer the underlying property

itself but instead transferred a chose in action.  The First

Circuit has not yet determined whether a chose in action--or any

other intangible property--can constitute a property right under

the expropriation exception to the FSIA.

The Southern District of New York and the D.C. Circuit have

reached contrary conclusions regarding whether "property" under

the expropriation exception must be tangible or can be intangible

as well.  *Compare Canadian Overseas Ores Ltd.* v. *Compania de*

*Acero Del Pacifico S.A.*, 528 F. Supp. 1337, 1346-47 (S.D.N.Y.

1982) (holding that the expropriation exception applies only to

tangible property), *and Friedar* v. *Gov't of Israel*, 614 F. Supp.
395, 399 (S.D.N.Y. 1985), *with Nemariam* v. *Fed. Democratic
Republic of Ethiopia*, 491 F.3d 470, 479-80 (D.C. Cir. 2007)
(holding that the expropriation exception applies to intangible
property as well).  I need not determine which of these positions
is the more persuasive, because the expropriation exception is
inapplicable here for another, more basic reason.

The Plaintiffs have not alleged facts that support the
proposition that the Defendants "took" the chose in action from
UTICo.  Even if one were to accept the Plaintiffs' allegations
that the Ukrainian municipal court decisions were tainted by
fraud in which the Defendants were involved, that the Defendants
failed to inform UTICo about the Ukrainian Supreme Court decision
and the subsequent municipal court dismissal, that the Defendants
failed to provide UTICo with copies of those decisions in a
timely manner, and that the Defendants failed otherwise to
support the validity of the Assignment in the United States
litigation, these facts nonetheless would not demonstrate that
the Defendants "took" the chose in action.  The disposition of
*Universal Trading & Investment Co.* v. *Kiritchenko* made this
clear.

The decision rendered by the United States District Court
for the Northern District of California ruling that UTICo did not
have standing to bring the action was based upon an independent
determination of Ukrainian law and did not rely on the Ukrainian

municipal court decisions.  Judge Chesney stated so explicitly in
her June 16, 2008, opinion.  She noted that UTICo failed to show
that receipt of the later Ukrainian court decisions into the
record in a timely fashion would have made any difference
whatsoever.  *Kiritchenko*, No. C-99-3073, 2008 WL 2445073, at *2.
The Ninth Circuit agreed that "UTI[Co] failed to prove the
assignment was valid under Ukrainian law." *Universal Trading &
Inv. Co., Inc.* v. *Kiritchenko*, 346 F.App'x 232, 232 (9th Cir.
2009).  I must apply collateral estoppel effect to that judgment
in this case and find the plaintiffs barred form contending
otherwise.

UTICo was unable to maintain its suit against Lazarenko and
Kiritchenko because United States courts have definitively ruled
that the Assignment was invalid under Ukrainian law, not because
of the actions of the Defendants.  The opinions in the
*Kiritchenko* litigation establish that the Ukrainian court
decisions (and the failure to submit the later court decisions
until dismissal had been granted) were not determinative.  UTICo
has therefore failed to carry its burden of production of
presenting evidence that the Defendants "took" any rights in
property belonging to UTICo or that the expropriation exception
applies.

**D.   *Immovable Property***

The Plaintiffs contend that the Defendants fall under the
"immovable property exception" to foreign sovereign immunity.

20

Under the FSIA, a foreign sovereign is not immune from suit in any case "in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue . . . ." 28 U.S.C. § 1605(a)(4).  The Plaintiffs contend that the immovable property exception applies here because "[t]he important component of UTICo's claims in the case *UTICo* v. *Kiritchenko et al.*, that included Lazarenko and their privies and companies, was the claim to the real properties."

This contention fails because no rights in property are at issue *in the instant case*.  Rights in property were at issue in the case being litigated in the U.S. District Court for the Northern District of California.  The Plaintiffs fail to recognize that while their contentions regarding the issues in this case relate to the course of that litigation, the cases are nonetheless distinct.  Indeed, the judgment in that litigation would appear to bar the Plaintiffs from pursuing that contention in this case.  In any event, the Plaintiffs have not sued the Defendants for rights in the properties in California or for rights in any other immovable property in the United States.  The Plaintiffs have requested relief for the breach of contract claim related to the Assignment in the form of the money equivalent of the chose in action that was unsuccessfully assigned.  Money alone is not a right in immovable property in the United States.

The Plaintiffs cite *Permanent Mission of India to the United Nations* v. *City of New York*, 551 U.S. 193 (2007), in support of the applicability of the immovable property exception to the instant case.  In *Permanent Mission of India*, the Supreme Court held that "§ 1605(a)(4) does not expressly limit itself to cases in which the specific right at issue is title, ownership, or possession."  *Permanent Mission of India*, 551 U.S. at 197-99.  Noting that a lien is an encumbrance on the land, and that "[a] lien on real property runs with the land and is enforceable against subsequent purchasers," the Court held that "an action seeking a declaration of the validity of a tax lien places 'rights in immovable property . . . in issue.'" *Id.* at 198.  Here, by contrast, a monetary judgment calculated on the worth of particular real properties does not have any effect on the land, its current owners, or its future purchasers.  Plaintiffs' suit may be related--in some general sense--to real estate in the United States, but it does not put rights in that real estate at issue and does not fall under the immovable property exception to foreign sovereign immunity.

## E.   *Commercial Activity*

Plaintiffs' only prospect for success is the commercial activity exception.  Under the FSIA, a foreign sovereign is not immune from suit in any case

> in which the action is based upon a commercial activity
> carried on in the United States by the foreign state; or
> upon an act performed in the United States in connection

> with a commercial activity carried on in the United States
> by the foreign state elsewhere; or upon an act outside the
> territory of the United States in connection with a
> commercial activity of the foreign state elsewhere and that
> act causes a direct effect in the United States . . . .

28 U.S.C. § 1605(a)(2).  The parties' dispute addresses whether
the action is based on "a commercial activity."  The Plaintiffs
contend that the series of agreements and powers of attorney
executed by UPGO, as well as the work conducted in service of
these agreements by UTICo and the attorneys that it hired,
constitute commercial activity on which the instant litigation is
based.

     Whether an action is based upon a commercial activity is
often a difficult question.  The FSIA defines "commercial
activity" as

> either a regular course of commercial conduct or a
> particular commercial transaction or act.  The commercial
> character of an activity shall be determined by reference to
> the nature of the course of conduct or particular
> transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).  "The problem, as the drafters of the FSIA
themselves admitted, is that the statute is vaguely worded and
offers little guidance to courts construing its terms."
*Transamerican S.S. Corp.* v. *Somali Democratic Republic*, 767 F.2d
998, 1002 (D.C. Cir. 1985).

     The Supreme Court has provided some direction regarding the
statute's application, stating:

> [T]he question is not whether the foreign government is
> acting with a profit motive or instead with the aim of
> fulfilling uniquely sovereign objectives.  Rather, the issue

> is whether the particular actions that the foreign state
> performs (whatever the motive behind them) are the *type* of
> actions by which a private party engages in "trade and
> traffic or commerce."

*Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 614

(1992).  However, even that guidance is not dispositive of most

cases; the Court has acknowledged "the difficulty of

distinguishing ''purpose' (*i.e.*, the *reason* why the foreign state

engages in the activity) from 'nature' (*i.e.*, the outward form of

the conduct that the foreign state performs or agrees to

perform),'" while "recogniz[ing] that the Act 'unmistakably

commands' us to observe the distinction" nonetheless.  *Saudi*

*Arabia* v. *Nelson*, 507 U.S. 349, 361 (1993).

The Defendants contend that the nature of the conduct at

issue here is governmental.  They argue that the conduct is

similar in all relevant ways to the conduct at issue in *In re*

*Estate of Ferdinand Marcos Human Rights Litigation*, 94 F.3d 539,

546 (9th Cir. 1996).  In *Marcos*, the "appeals concern[ed] whether

a United States court properly enjoined the Republic of the

Philippines from entering into agreements with the Estate of

former Philippine President Ferdinand Marcos to transfer to the

Philippines assets of the Estate that the Republic assert[ed]

were looted from the Philippines treasury."  *Marcos*, 94 F.3d at

541.  The Ninth Circuit held that such agreements and transfers

did not constitute commercial activity.  It stated:

> [The Plaintiff] argues that the Republic is attempting to
> recover indebtedness, while the Republic describes itself as

24

> pursuing misappropriated public assets.  The Republic's
> description is more accurate, in that a governmental agency
> of the Philippines is acting under statutory mandate to
> recover property allegedly stolen from the treasury.  This
> exercise of police power is a governmental rather than
> commercial activity, and, thus, the commercial-activity
> exception does not apply.

*Id.* at 546.  The Defendants argue that, like the Philippines in

*Marcos*, Ukraine in the instant case was pursuing misappropriated

public assets instead of engaging in commercial activity under

the FSIA.

The facts in the instant case differ in an important way

from *Marcos*.  Ukraine was not collecting its expatriated assets

solely by means of its own employees and agencies, as the

Philippines did in *Marcos*.  Instead, Ukraine hired an outside

agent--UTICo--to engage in asset recovery on its behalf.  It is

the contract between those two parties, and not the asset

recovery itself, that is at issue in this case.

The contract between Ukraine and UTICo is not inherently

governmental and does not address services that could be rendered

to or provided by only a governmental entity.  UTICo's website,

referenced in the Complaint, describes many types of private

clients that hire UTICo to recover misappropriated assets.

Similarly, the affidavit submitted by W. Scott Thompson, Chairman

of the Board of UTICo, states that UTICo's asset recovery clients

have included "banks, corporations, [and] private individuals" as

well as "foreign government entities."  The Defendants have not

attempted to distinguish between the services that UTICo provided

25

to Ukraine and the services that it regularly provides to private clients.

So, even assuming that the Ninth Circuit was correct in holding that an asset recovery operation conducted by a government is not a commercial activity, Ukraine's entrance into the market and its hiring of a private entity to recover assets on its behalf was a commercial act.  The Eleventh Circuit addressed a similar situation in *Honduras Aircraft Registry, Ltd. v. Government of Honduras*, 129 F.3d 543 (11th Cir. 1997), in which the government of Honduras hired a private company to set up an aircraft registry.  The Eleventh Circuit stated:

> Only Honduras could actually admit aircraft to its registry--that is a part of sovereignty upon which others may not encroach.  But this case involves more than the exercise of that sovereign right.  Apparently Honduras did not have the resources or the technical expertise to conduct its own aircraft inspections or to set up a registry . . . . Honduras therefore ventured into the marketplace to find the expertise and resources needed to accomplish those tasks. All of those underlying activities were commercial in nature and of the type negotiable among private parties.  After receiving the plaintiff companies' proposal, Honduras . . . contracted with the plaintiffs for certain goods, services, and other economic assistance to support its new civil air program . . . . Honduras could have stayed out of the marketplace by keeping this project all under the sovereignty umbrella.  It could have explored the possibility of hiring plaintiffs and plaintiffs' personnel as government employees.  Instead, however, Honduras exercised its business judgment and contracted in the marketplace with non-government companies to do and supply what it needed.

*Id.* at 547.  The Eleventh Circuit concluded that when Honduras hired a private company for assistance in its governmental actions, it engaged in commercial activity.  *Id.*

Similarly, in *Guevara* v. *Republic of Peru*, 468 F.3d 1289 (11th Cir. 2006), the Eleventh Circuit held that making a contractual offer of reward for information leading to the capture of a fugitive constitutes commercial activity.  While "[t]he location and capture of a fugitive by law enforcement officials of a country may be a sovereign act," *Guevara*, 468 F.3d at 1298, the courts held contracting to pay for information is not.  "The underlying activity at issue--the exchange of money for information--is 'commercial in nature and of the type negotiable among private parties.'"  *Id.* at 1299 (internal citation omitted).  The Eleventh Circuit stated that "Peru's attempt to lower the level of generality from a contract for the sale of information down to one of reward for information leading to the capture of a fugitive focuses on the purpose instead of the nature of the transaction."  *Id*. at 1302.

Here, Ukraine, like the government of the Phillipines, could have conducted its own asset recovery program.  Instead, like the governments of Honduras and Peru, it chose to enter the marketplace, and contracted with UTICo in the same manner that a private company seeking to recover misappropriated assets would.  The underlying activity at issue--the exchange of money for assistance in recovering misappropriated assets on an international scale--is the type negotiated among private parties; it is, in fact, the basis of UTICo's business, which serves private as well as public clients.  Ukraine's attempt to

lower the level of generality from a contract for the sale of asset recovery services to a contract for the sale of services to recover *public* assets impermissibly focuses on the purpose rather than the nature of the transaction. *See also NML Capital, Ltd.* v. *Republic of Argentina*, 680 F.3d 254, 259 (2d Cir. 2012) (holding "governmental purpose of the commercial activity does not immunize" activity from commercial activity exception to FSIA).

The legislative history of the FSIA, as recounted in the Reporters' Notes in the Restatement (Third) of Foreign Relations Law, supports the Eleventh Circuit case law and its applicability to the instant case.

> [T]he State Department's Legal Adviser and the Department of Justice . . . told the House Committee:
>> [U]nder the restrictive theory of immunity, if a government enters into a contract to purchase goods and services, that is considered a commercial activity.  It avails itself of the ordinary contract machinery.  It bargains and negotiates.  It accepts an offer.  It enters into a written contract and the contract is to be performed.  So it is not all that important whether the entity is a commercial entity that enters into the contract, but what is of importance is that you conduct activities in the same manner as ordinary trading activities.
>
> Jurisdiction of the U.S. Courts in Suits against Foreign States, Hearings on H.R. 11315 Before the Subcomm. On Administrative Law and Governmental Relations, 94th Cong., 2d sess., p. 51 (1976) (remarks of B. Ristau).

Restatement (Third) of Foreign Relations Law § 453 (1987), Reporters' Notes.  Here, Ukraine purchased UTICo's services after bargaining, negotiating, and entering into a written contract. Ukraine may not now claim immunity from UTICo's suit after

engaging in these commercial activities with UTICo in the United
States.

While the First Circuit has not ruled on precisely this
issue, there is reason to believe that it will be in accord.  In
*Fagot Rodriguez* v. *Republic of Costa Rica*, 297 F.3d 1 (1st Cir.
2002), the First Circuit held that "entering into a contract for
lease of property constitutes 'commercial activity.'" *Id.* at 6.
In support of this holding the First Circuit cited cases from the
Fifth and Seventh Circuits.  It characterized *Walter Fuller
Aircraft Sales, Inc.* v. *Rep. of the Philippines*, 965 F.3d 1375
(5th Cir. 1992), as "noting the commercial nature of the making
or breaching of a contract" and *Rush-Presbyterian-St. Luke's
Medical Center* v. *Hellenic Republic*, 877 F.2d 574 (7th Cir.
1989), as "noting that contracts for the purchase or sale of
goods or services are presumptively 'commercial activities.'"
The First Circuit approved of the holdings as thus characterized
and relied on them for its own holding.  My determination that
the commercial exception is applicable here moves in the
direction that the First Circuit identified in *Fagot Rodriguez*.
I hold that Ukraine's contract with UTICo for the purchase of
services was a commercial activity and that this action is
therefore subject to the commercial activity exception of the
FSIA.

### III.  VENUE

The Defendants also move pursuant to Federal Rule of Civil Procedure 12(b)(3) to dismiss the Plaintiffs' claims on venue grounds.  "When an objection to venue has been raised, the burden is on the plaintiff to establish that venue is proper in the judicial district in which the action has been brought." *Transamerica Corp.* v. *Trans-Am. Leasing Corp.*, 670 F. Supp. 1089, 1090 (D. Mass. 1987).  "In ruling on a motion filed under Rule 12(b)(3), all well-pleaded allegations in the complaint bearing on the venue question generally are taken as true, unless contradicted by the defendant's affidavits.  A district court may examine facts outside the complaint to determine whether its venue is proper."  *Turnley* v. *Banc of Am. Inv. Services, Inc.*, 576 F. Supp. 2d 204, 211 (D. Mass. 2008) (internal citation omitted).

Venue with respect to civil actions against foreign states is governed by 28 U.S.C. § 1391(f).  This provision states, in relevant part:

> A civil action against a foreign state . . . may be brought:
> (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; . . . . or
> (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or a political subdivision thereof.

28 U.S.C. § 1391(f).  The Defendants contend that no substantial part of the events or omissions giving rise to the claim occurred

30

in Massachusetts and that the Plaintiffs therefore chose an
improper venue.  Instead of transfer to the U.S. District Court
for the District of Columbia, they request dismissal of the case
pursuant to 28 U.S.C. § 1406.

In evaluating whether a "substantial part of the events or
omissions giving rise to the claim" occurred in a given district,
"courts have recognized that particular attention should be paid
to those core aspects of any contract dispute, including where
the contract was negotiated or executed, where it was to be
performed, and where the alleged breach occurred." *Wye Oak
Tech., Inc.* v. *Republic of Iraq*, No. 1:09CV793, 2010 WL 2613323,
at *10 (E.D. Va. June 29, 2010), *aff'd*, 666 F.3d 205 (4th Cir.
2011).  Here, W. Scott Thompson, Chairman of UTICo's Board,
submitted an affidavit stating that over ninety percent of the
contract performance occurred in Massachusetts.  It is apparent
from the Powers of Attorney that the vast majority of the
attorneys hired to work on Ukraine's behalf by UTICo were
licensed in Massachusetts and worked at Massachusetts firms.  The
Defendants present no countervailing evidence.

The Defendants contend that even assuming the contract
performance occurred in the judicial district of Massachusetts,
it was not UTICo's performance that gave rise to its claims.  I
disagree.  UTICo's performance is a significant component of the
contract claims and constitutes an event giving rise to the
claims.  *See Tonoga, Ltd.* v. *Ministry of Pub. Works & Hous. Of*

*Kingdom of Saudi Arabia*, 135 F. Supp. 2d 350, 356-59 (N.D.N.Y. 2001) (finding venue in the Northern District of New York where a substantial portion of the contract was performed there).  The Defendants cite no case law, and I am aware of none, that limits "events . . . giving rise to the claim" to the precise location of the breach alone.  Here, a substantial part of the events occurred in Massachusetts.[5]

## IV.  FAILURE TO STATE A CLAIM

The Defendants also move to dismiss each Count of the Complaint, as well as the Foundation, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

### A.  *Standard of Review*

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).  All well-pleaded factual allegations in the complaint must be taken as true and all reasonable inferences must be drawn in the pleader's

---

[5]  Neither party specifically addresses the proper venue in the context of the tort claims in the Complaint.  On this record where it appears the injury was felt in Massachusetts, where the tort claims are intertwined with contract claims and the contract performance took place in Massachusetts, and where the issue has not been briefed with particularity, I will not dismiss or transfer the case on the basis of the tort claims.

favor. *SEC* v. *Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en
banc).   Unless the alleged facts push a claim "across the line
from conceivable to plausible," the complaint is subject to
dismissal.  *Iqbal*, 556 U.S. at 680.

**B.    *Choice of Law***

The Plaintiffs' Complaint presents six different common law
claims as well as a request for declaratory judgment.   Given the
international nature of both the parties and the events
underlying the Complaint, this case potentially raises difficult
if perhaps interesting choice-of-law issues.   However, the
parties, without engaging in a choice-of-law analysis, appear to
have been content to apply Massachusetts common law to both
contract and tort claims in their briefing.   "Because the parties
agree that Massachusetts law governs this dispute, and because
there is at least a 'reasonable relation' between the dispute and
the forum whose law has been selected by the parties, [I] will
forego an independent analysis of the choice-of-law issue and
apply Massachusetts law."  *Merchants Ins. Co. of New Hampshire,
Inc.* v. *U.S. Fidelity and Guar. Co.*, 143 F.3d 5, 8 (1st Cir.
1998).

**C.    *Substantive Claims***

**1.    Breach of Contract (Assignment)**

In Count One, the Plaintiffs allege that the Defendants
breached the Assignment by failing to support its validity under

33

Ukrainian law.  The claim appears to be based on two allegations: (1) the Defendants did not support, and perhaps undermined, the validity of the Assignment in the Ukrainian courts; and (2) the Defendants did not support UTICo's litigation in the United States District Court for the District of Northern California by failing to apprise UTICo of the Ukrainian court decisions in a timely manner and by failing to draft briefs in support of UTICo on appeal.

The Plaintiffs, however, have not shown that the Ukrainian court decisions caused their injury.  The decisions in the United States courts, and not the Ukrainian courts, denied UTICo the right to proceed based on the Assignment.  The opinions from the United States courts did not rely on the decisions from the Ukrainian courts.  *See supra* Part II.C.  To the extent that Count One is based on the Defendants' alleged misdeeds in relation to the Ukrainian court decisions, it must be dismissed because of the lack of causation.

To the extent that Count One is based on the Defendants' failure to support the validity of the Assignment in the United States courts, it fares no better.  Most fundamentally, the collateral estoppel effect of the *Kiritchenko* litigation in the Northern District of California would appear to bar the claim.  I may not entertain the claim because (1) the issue of the validity of the Assignment was involved in that action; (2) the issue was actually litigated; (3) the issue was determined by a valid and

binding final judgment; and (4) the determination of the issue
was essential to the judgment.  *See Ramallo Bros. Printing, Inc.*
v. *El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007) (listing the
elements of collateral estoppel).

In any event, even if the claim is not estopped, no clause
in the Assignment obligates the Defendants to support its
validity in court.  The Plaintiffs contend that the Assignment
incorporated by reference the May 15, 1998, Agreement, which
stated that "the Prosecutor General's Office of Ukraine confirms
its commitment to engage for that the appropriate State bodies of
Ukraine and to appropriately secure the permission for the above
remuneration."  However, that clause does not obligate the
Defendants to support the validity of the Assignment in the
*United States* court system.  It refers to securing permission
from the appropriate *Ukrainian* governmental entities to pay
UTICo.  It was included in the May 15, 1998, Agreement before any
assignment, much less the need to support that assignment in
foreign courts, was even contemplated.

The Plaintiffs have failed to state a claim upon which
relief can be granted regarding the alleged breach of the
Assignment.  I therefore will grant the Defendants' motion to
dismiss with respect to Count One.

### 2.   Breach of Contract (1998 Agreements)

The Plaintiffs separately claim in Count II that the
Defendants breached the 1998 Agreements by not providing payment

35

for expropriated assets returned to Ukraine.  The Plaintiffs
allege that UTICo was instrumental in freezing over $270 million
in assets that is available for collection by Ukraine.  They
request twelve percent of the value of these assets.

The Defendants first contend that no money is yet due under
the Agreement because the Complaint does not allege that any
assets have been transferred to Ukraine.  The assets have been
frozen but they have not been collected.  Especially given the
vagaries of translation, I hold that the Agreement's language is
ambiguous.  It refers to "a commission of 12 (twelve) percent on
all and any above assets to be returned to Ukraine."  It is not
clear from the Agreement what constitutes a "return"--such a
return might require that the assets be transferred to Ukraine's
bank accounts or it might require only that the assets simply be
made available for Ukraine's collection.

According to the Defendants, the clause in the Agreement
that UPGO "confirms its commitment to engage for that the
appropriate State bodies of Ukraine and to appropriately secure
the permission for the above remuneration, taking into account
that that remuneration is not payable from the State budget of
Ukraine but from the assets to be repatriated to Ukraine from
outside of Ukraine" supports their interpretation of the
Agreement.  I do not agree.  The statement expresses that
remuneration is available only from the repatriated assets.  It
does not state that those assets are only considered

36

"repatriated" or "returned" once they are in Ukrainian coffers. It does not discuss when payment is due and does not resolve the ambiguity of the phrase "returned to Ukraine." This issue of contract interpretation is not appropriately resolved at the motion to dismiss stage; extrinsic evidence will be necessary to establish the parties' intent.

The Defendants also contend that even if the Agreement is interpreted to mean that a twelve percent commission is due on all assets *made available* to Ukraine, the statute of limitations has run. In Massachusetts, the statute of limitations for a breach of contract is six years. G.L. c. 260, § 2. The Complaint alleges that the freezing of assets took place in 1999 and 2000; more than six years have passed since the Defendants' debt has accrued.

The Plaintiffs respond that the Agreements and other instruments from UPGO were under seal and so are subject to a longer statute of limitations. In Massachusetts, the statute of limitations for a breach of contract action based upon a contract under seal is twenty years. G.L. c. 260, § 1. If the May 15, 1998, Agreement is a sealed document, then the statute of limitations on actions for its breach has not run. The Plaintiffs contend that UPGO's official stamp, placed at the bottom of each Agreement and Power of Attorney, constitutes a seal.

"Whether an instrument is under seal or not is a question

for the court upon inspection.  Whether a mark or character shall be held to be a seal depends upon the intention of the executant, as shown by the paper." *Jacksonville, M., P. Ry. & Nav. Co.* v. *Hooper*, 160 U.S. 514, 519.  Based on the papers presented before me and on guidance from the Massachusetts courts, I agree with the Defendants that UPGO's official stamp does not operate as a seal on these contracts.  "In similar circumstances authorities have construed a corporate seal stamp as authentication of the authority of the signing officers and not as a manifestation of intent that the instrument is under seal." *Kingston Housing Authority* v. *Sandonato & Bogue, Inc.*, 577 N.E.2d 1, 4 (Mass. App. Ct. 1991).

The Massachusetts Appeals Court in *Kingston Housing Authority* cited *President & Directors of Georgetown College* v. *Madden*, 660 F.2d 91 (4th Cir. 1981) (per curiam) in support of its holding.  In that case, the Fourth Circuit stated:

> The contract at issue here did not contain the familiar phrases, "witness my hand and seal," or "signed and sealed," nor did its body refer to the fact that it was under seal. Without such indications that the parties intended to make the contract a sealed instrument, the combination of the word "(Seal)" and the corporate impressions was insufficient to establish such an intention.

*Madden*, 660 F.2d at 96.  Here, the instrument includes even fewer indications that it is under seal; the word "(Seal)" or similar does not appear.  There is no indication that the stamp was placed to signify anything more than the authority of the signatory, and I interpret it to operate in that way.  "Such an

interpretation is appropriate in light of the diminished significance of the seal in contemporary law and practice . . . ." *Kingston Housing Authority*, 577 N.E.2d at 5.

The Plaintiffs contend that the stamp must signify a seal because "UPGO does not have any seal other than the one that was affixed on the contractual documents with UTICo" and because "[o]ther than that sole official seal, UPGO would be left with no seal at all, a nonsensical proposition." The Plaintiffs misunderstand the thrust of the modern case law. Ukraine is able to signify that a document is under seal; the mere affixing of a stamp, however, is insufficient to do so. Had the parties included, for instance, a recitation that Ukraine's seal had been affixed, the stamp would likely have signified a seal. *See Gildenhorn* v. *Columbia Real Estate Title Ins. Co.*, 317 A.2d 836, 841–46 (Md. 1974). But, I cannot ignore the modern restrictive trend regarding sealed contractual agreement, by finding as a matter of law that the 1998 Agreement and other documents on which UPGO's stamp is affixed to be sealed documents under G.L. c. 260, § 1. I conclude that the relevant documents at issue are not under seal and consequently the extended statute of limitations is not appropriate.

Nevertheless, I cannot conclude on this record that the statute of limitations has run as a matter of law. "The general rule in breach of contract cases is that a cause of action

accrues when the contract is breached." *Flannery* v. *Flannery*, 429
Mass. 55, 58 (Mass.  1999).   Given the filing of this action in
November 2010 and the six-year statute of limitations, the
question is whether breach occurred before November 2004.   Breach
is commonly understood to occur when a party fails to perform a
contractual duty when it is due.   *See generally* 23 Williston on
Contracts § 63:1 (4th ed. 2012).

According to the Plaintiffs, the Agreement is open-ended
regarding payment, with no particular due date, and they have
brought the action now because Ukraine only just repudiated its
obligation to pay.   Neither party, however, gives serious
attention to the import of a contract with no date assigned to
the payment term, when a cause of action for non-payment would
accrue, or when the statute of limitations would begin to run
under such a contract.   For example, the Defendants simply posit
that, assuming Plaintiffs are correct that UTICo performed under
the contract when it froze certain assets in 1999 and 2000,
payment simultaneously came due.   But that interpretation
altogether ignores the rule that when an "agreement specifie[s]
no time for payment, the law fills that gap; where a contract
fails to specify a time for performance, 'it is as if 'within a
reasonable time' were found in it.'"   *Arno* v. *Arbella Mut. Ins.
Co.*, No. 03-1301, 2005 WL 2739905, at *1 (Mass. Super. Aug. 26,
2005) (quoting *Warren* v. *Ball*, 170 N.E. 2d 341, 344 (Mass.

1960)).   Further briefing and consideration of extrinsic evidence
will likely be required to resolve these issues.

In any event, it is sufficient for present purposes that
Plaintiffs believed they had arranged to receive payment, which
satisfied any immediate performance obligations, in the form of
the 1999 Assignment of the chose of action relating to
Kiritchenko's and Lazarenko's properties in the United States.
Not until 2007 did the federal court in California declare the
Assignment invalid.   And although the first Ukranian decision
invalidating the Assignment came in 2003, UPGO continued to
defend the Assignment in the Ukranian courts well into the
limitations period, including its August 2005 appeal to the
Supreme Court of the Ukraine.

Viewing these facts most favorably to the Plaintiffs,
Ukraine did not renege on its promise to pay via the Assignment
until well after November 2004.   At the very least, as of
November 2004, Plaintiffs reasonably believed that "negotiations
[with Ukraine as to payment] were ongoing and that no breach had
yet occurred or even would occur." *Yelle* v. *United Water
Springfield LLC*, 795 F. Supp. 2d 169, 175 (D. Mass. 2011).   At
this stage, then, I cannot say as a matter of law that breach
occurred prior to November 2004.   I will therefore deny the
Defendants' motion to dismiss with regard to Count Two.

### 3.   Unjust Enrichment

In Count Three of the Complaint, the Plaintiffs claim that the Defendants have been unjustly enriched by UTICo's work.  They allege that, in addition to the assets frozen internationally, Ukraine was able to seize about twenty industrial plants and an airline domestically due to the investigation conducted and evidence gathered by UTICo.

To the extent that the Plaintiffs' unjust enrichment claim depends upon the failure to pay for the work resulting in frozen assets internationally, this claim cannot be pursued as unjust enrichment.  "The law will not imply a contract where there is an existing express contract covering the same subject matter." *Zarum* v. *Brass Mill Material Corp.*, 134 N.E.2d 141, 143 (Mass. 1956).  Where there is an suitable remedy at law, "there is no occasion to invoke equitable remedies." *Popponesset Beach Ass'n, Inc.* v. *Marchillo*, 658 N.E.2d 983, 988 (Mass. App. Ct. 1996). Here, the parties' 1998 Agreement governs remuneration for work resulting in misappropriated assets returned to Ukraine; there is no occasion to maintain a claim of unjust enrichment.

To the extent that the Plaintiffs' unjust enrichment claim depends on the Defendants' "enrichment" through its use of the evidence provided by UTICo in domestic asset recovery operations, it is no more successful.  If the acquisition of such information is governed by the Agreement, then, here again, the claim is one

42

of an express contract and does not sound in unjust enrichment.

If the Plaintiffs contend that this claim is wholly separate from the Agreement, and that the Defendants must pay them for information used in domestic operations on an equitable theory of implied contract, then the claim is time-barred.  Ukraine appears to have used the information provided in domestic investigations and prosecutions in approximately 1999 and 2000.[6]  The statute of limitations for an unjust enrichment claim is six years at most.[7] This case was filed in November, 2010, at which point the claim for unjust enrichment, to the extent that it can be made independently of the contract claim, was time-barred.[8]

------

[6]   Although the exact dates of the alleged enrichment are not clear from the Complaint, this appears to be approximately when those events are alleged to have occurred.  In their Memorandum in Support of their Motion to Dismiss, the Defendants note that it appears from the Complaint that UGPO used the evidence obtained from UTICo to seize assets within Ukraine in approximately 1999.  The Plaintiffs do not contest this date in their Opposition or otherwise argue that the appropriate statute of limitations has not yet run.

[7]   "In Massachusetts the statutes of limitation applicable to law actions based on contract and tort are also applicable to suits in equity."  *Desmond* v. *Moffie*, 375 F.2d 742, 743 (1st Cir. 1967).  "The court must look to the 'gist of the action' or the essential nature of the plaintiff's claim in determining what statute of limitations to apply."  *Palandjian* v. *Pahlavi*, 614 F. Supp. 1569, 1577 (D. Mass. 1985).  Here, regardless of whether the tort statute of limitations of three years, *see* G.L. c. 260, § 2A, or the contract statute of limitations of six years, *see* G.L. c. 260, § 2, applies, the time for filing has passed and this claim is time-barred.

[8]   The tolling theory – that arguably no breach occurred within the limitations period – applied above to the Plaintiffs' contract claim, *see supra* Part IV.C.2, would not apply here.  As

### 4.   Fiduciary Duty

In Count Four, the Plaintiffs claim that by failing to eliminate challenges to the Assignment or to have the Assignment ratified by the President, the Defendants breached their fiduciary duty to UTICo.  They allege that such a fiduciary duty arose because the Defendants were party to the 1998 Agreements and the 1999 Assignment.  I disagree.  Neither of these contracts established fiduciary duties owed by the Defendants to UTICo.

A claim for breach of fiduciary duty has four elements: (1) the existence of a fiduciary duty arising from a relationship between the parties, (2) the breach of that duty, (3) damages, and (4) a causal relationship between the breach and the damages. *Hanover Ins. Co.* v. *Sutton*, 705 N.E.2d 279, 288-89 (Mass. App. Ct. 1999).  The Plaintiffs' claim of breach of fiduciary duty stumbles at the threshold: the Defendants owed no fiduciary duties to UTICo.

The 1998 Agreement making UTICo the agent for Ukraine did not establish such a duty; the fiduciary duties in an agency relationship travel in the opposite direction.  "A principal, at times, owes some duties to its agent.  However, there is no

---

to the legal contract claims, it can be argued the plaintiffs were to be paid for their work pursuant to the 1998 contract through the 1999 Assignment and thus no claim for breach accrued at least so long as UPGO continued to defend the assignment. There are no such allegations that the Plaintiffs believed, or had reason to believe, that they had been paid for their work under a separate contract implied in equity.

44

authority to support the position that the principal owes his
agent a *fiduciary* duty." *Stavaridis* v. *Dynamic Mach. Works,
Inc.*, 2 Mass. L. Rptr. 446, 446, No. 911276E, 1994 WL 879484, at
*3 (Mass. Super. July 29, 1994) (internal citation omitted).
Here, while the 1998 Agreement established fiduciary duties owed
by UTICo to Ukraine, it did not establish the opposite.

The 1999 Assignment purportedly transferring Ukraine's chose
in action to UTICo did not establish fiduciary duties owed by
Ukraine.  An assignment is insufficient to create a fiduciary
relationship.  *Yamins* v. *Zeitz*, 76 N.E.2d 769, 772 (Mass. 1948)
("Counsel for the plaintiff properly concedes that the mere
relation of the assignor and the assignee of a lease does not,
without more, give rise to a confidential relationship.").  The
Plaintiffs offer no additional reason to find that a fiduciary
relationship exists.

Because the Plaintiffs have not pled facts sufficient to
demonstrate that the Defendants owed UTICo a fiduciary duty, I
will dismiss Count Four.[9]

---

[9]  I note the Defendants additionally contend that the claim
is time-barred by the three year statute of limitations that
ordinarily governs claims of breach of fiduciary duty.  However,
the Plaintiffs include among their allegations that the
Defendants breached their fiduciary duties by failing to apprise
UTICo of the Ukrainian court decisions and by failing to support
UTICo in the United States litigation in a timely manner.
UTICo's appeals in the United States litigation were concluded in
2010, the same year that this case was filed.  Thus, *if* the
failure to support UTICo with an amicus brief had constituted a
breach of fiduciary duties, the claim would not have been time-
barred.

### 5 & 6. Misrepresentation and Negligence

In Counts Five and Six of the Complaint, the Plaintiffs claim that the Defendants are liable for misrepresentation and for negligence due to their failure to inform UTICo in a timely manner of the Ukrainian Supreme Court decision and the subsequent municipal court decision.  As I have noted, however, the Plaintiffs have not shown that their injury was caused by the Defendants' failure to give them timely notification of the Ukrainian court decisions.  It was the disposition of *Universal Trading & Investment Co.* v. *Kiritchenko* that denied UTICo the right to proceed based on the Assignment of the chose in action.  The opinions in  *Universal Trading & Investment Co.* v. *Kiritchenko* did not rely on the decisions from the Ukrainian courts.  *See supra* Part II.C.

The Plaintiffs contend that they may nevertheless pursue these claims because "UTICo learned of the disposition in the Lazarenko[] matter only *after* the adverse judgment" and "[t]he criteria of Rule 60(b) are entirely different from submitting evidence at a pre-judgment stage."  While such an argument might be compelling in the context of an opinion rendered solely in accordance with the customary standard under Rule 60(b), here Judge Chesney made clear in her opinion that it would have made no difference even if the decisions had been received by the court *prior* to the initial judgment.  She stated that the

"[P]laintiff failed to show any failure to disclose those decisions affected, in any manner, this Court's determination of the issues addressed in the Summary Judgment Order." *Kiritchenko*, No. C-99-3073, 2008 WL 2445073, at *2.

Given Judge Chesney's explicit statements that the submission of the later Ukrainian court decisions would have made no difference and that her decision was based on her own independent analysis of Ukrainian law, the Plaintiffs have not made a plausible claim that the Defendants' alleged misrepresentation and negligence caused them any injury. The Plaintiffs have not established that they have standing to raise either the misrepresentation or the negligence claim. I will therefore dismiss Counts Five[10] and Six[11] of the Complaint.

---

[10]   The Defendants also contend that Count Five fails because the Complaint does not allege a misrepresentation, but rather a failure to disclose. "However, Massachusetts law allows negligent misrepresentation claims to be predicated upon a failure to disclose." *First Marblehead Corp.* v. *House*, 473 F.3d 1, 9 (1st Cir. 2006). The parties have insufficiently briefed whether the Defendants were under a duty to exercise reasonable care to disclose the Ukrainian court decisions to UTICo. I will not decide the issue, having determined that the claim fails regardless for the reasons discussed above.

[11]   The Defendants also contend that Count Six fails because the Complaint does not allege any loss beyond the purely economic. The Massachusetts Supreme Judicial Court has "affirmed that purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *FMR Corp.* v. *Boston Edison Co.*, 613 N.E.2d 902, 903 (Mass. 1993). In briefing, the Plaintiffs contend that the loss was more than purely economic, because as a result of the repudiation of the Assignment, the assets were released to criminals, who have been accused of, among other things, contract

7.   **Declaratory Judgment**

In Count Seven of the Complaint, the Plaintiffs claim that they are entitled to declarations that (1) UTICo is not subject to Ukrainian jurisdiction and no Ukrainian court decisions concerning it will be recognized in Massachusetts and (2) the April 30, 1999, Power of Attorney empowering UTICo to "organize and implement in the USA the legal work" to recover the California real estate was in force until at least the denial of UTICo's petition for certiorari by the United States Supreme Court in 2010.  The first of these requests does not present an actual case or controversy to this Court; it will therefore be dismissed.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Declaratory Judgment Act jurisdiction must, however, be compatible with the case or controversy requirement under Article III.  *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118,

---

murders.  These facts are not alleged in the Complaint. Moreover, they do not relate to loss caused *to the Plaintiffs*. The Plaintiffs have not established that they have in any way been harmed by contract murders and other unpleaded crimes.  The economic loss doctrine provides a second basis for the dismissal of Count Six.

126 (2007).  The Supreme Court has required that the dispute
resolved by declaration be "'definite and concrete, touching the
legal relations of parties having adverse legal interests'; and
that it be 'real and substantial' and 'admi[t] of specific relief
through a decree of a conclusive character, as distinguished from
an opinion advising what the law would be upon a hypothetical set
of facts.'" *Id.* at 127 (internal citation omitted, alteration in
original).

    The Plaintiffs present no actual case or controversy
requiring a determination of whether Ukrainian courts have
jurisdiction over UTICo.  The Plaintiffs have not shown that
there is a case pending in Massachusetts in which a Ukrainian
court decision regarding UTICo might be recognized or that the
Defendants are otherwise engaged in attempts to attain
recognition in Massachusetts of a Ukrainian court decision
regarding UTICo.  The Plaintiffs do not respond to the
Defendants' challenge to this component of their declaratory
judgment claim, and they have not alleged facts that demonstrate
an actual claim or controversy on this point.  I therefore will
dismiss Count Seven to the extent that it relates to the
requested declaration regarding Ukrainian jurisdiction over and
Ukrainian court decisions concerning UTICo.

    The Plaintiffs do, however, argue that the declaration
related to the Power of Attorney touches directly on the legal

obligations of the Defendants to UTICo, namely on whether the
Defendants have an obligation to pay UTICo for the legal work
related to the *Kiritchenko* litigation.   In their Reply Brief, the
Defendants concede that "[w]ere Plaintiffs' other claims to
survive, there could theoretically be need to decide how long the
alleged powers of attorney were effective, assuming . . . it
could effect the damages calculation."   In light of the
Defendants' concession, and the fact that Count Two for breach of
the 1998 Agreements has survived, I will not dismiss the
declaratory judgment claim to the extent that it relates to the
April 30, 1999, Power of Attorney.

   **D.   *The Foundation***

   The Complaint states that the Foundation is a Massachusetts
non-profit that "has an interest in the outcome of this action"
because "UTICo made commitments to allocate a substantial portion
of the fees for the work described herein to the Foundation's
charitable work, including funding of orphanages in Ukraine."
Compl. ¶ 2.   That is the only discussion in the Complaint of the
role of the Foundation in the controversy.   The Complaint
requests relief for the Foundation based only on Counts One and
Two for breach of contract.

   The Foundation is not a party to the Agreements or any
contract with the Defendants.   The Plaintiffs claim that the
Foundation is a third-party beneficiary to the Agreements between

50

UTICo and the Defendants.  "In order to prevail under this theory the plaintiff[s] must show that the defendant[s] and [UTICo] intended to give [the Foundation] the benefit of the promised performance.  We look at the language and circumstances of the contract for indicia of intention.  The intent must be clear and definite."  *Anderson* v. *Fox Hill Vill. Homeowners Corp.*, 676 N.E.2d 821, 822 (Mass. 1997) (internal citations omitted).  Here, neither the language nor the circumstances of the contract indicate the intent of the parties to the contract to give the Foundation the benefit of the promised performance.

The language in neither the 1998 Agreement nor any other document described in the Complaint indicates such an intent. The Agreement does not mention the Foundation and does not mention how the commission earned by UTICo would be spent.  Nor is such discussion found in any of the Powers of Attorney or letters that the Plaintiffs raised in the Complaint or attached to their briefing.

The circumstances of the contract are similarly devoid of an indication of an intent to benefit the Foundation.  The Plaintiffs allege in their Opposition that in 2003 UTICo communicated to then Prime Minister of Ukraine Victor Yanukovich that it was going to make a contribution to the orphanages in Ukraine through its charitable affiliate and that this communication was acknowledged.  Assuming that this is true, this

51

argument does not begin to establish the intent of the parties to benefit the Foundation.  A conversation about how UTICo planned to spend its compensation conducted five years after the Agreement was executed demonstrates nothing about the intent of the parties at the time, and certainly demonstrates nothing about the knowledge or intent of the *Defendants* at the time of contract formation.

The Plaintiffs have adduced no facts in support of the contention that the Foundation is a third-party beneficiary to the 1998 Agreement or to any other contract between UTICo and the Defendants.  Nor have the Plaintiffs contended that the Foundation has standing to pursue this suit based on any other ground.  I therefore will dismiss all claims to the extent that they are raised by the Foundation.

### V.   CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss (Dkt. No. 27) is GRANTED in part but DENIED as to Count Two with respect to Plaintiffs' claim for reimbursement for their recovery efforts and as to Count Seven to the degree a determination of the duration of the April 30, 1999 Power of Attorney may be implicated in a resolution of Count II.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT